# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SPRINT NEXTEL CORPORATION, *et al.*          :
:
:
v.                                           :          Civil No. CCB-13-617
:
:
SIMPLE CELL INC., *et al.*                   :
:
:

## <u>MEMORANDUM</u>

Plaintiffs Sprint Nextel Corporation and Sprint Communications Company, LP (collectively, "Sprint") have filed this action alleging that the defendants, various entities and individuals in the business of reselling mobile devices, unlawfully obtained and dealt Sprint devices without Sprint's authorization and to its detriment. Sprint has filed a motion for partial summary judgment against defendants Wireless Buybacks LLC, Wireless Buybacks Holdings LLC, Kevin Lowe, Edward Salkeld, and Brendan Skelly ("the Wireless Buybacks defendants") and defendants Simple Cell, Inc., Christopher Metzger, and Nicholas F. Skelly ("the Simple Cell defendants"). Wireless Buybacks defendants and Simple Cell defendants have both filed responses and cross motions for partial summary judgment.[1] Wireless Buybacks, LLC also has moved for relief from a previously entered temporary restraining order ("TRO").

For the following reasons, Sprint's motion for partial summary judgment will be granted in part and denied in part. The cross motions by Wireless Buybacks defendants and Simple Cell

---

[1] The Simple Cell defendants' cross motion for summary judgment also requests summary judgment in favor of Shannon Skelly, another defendant in the case. Shannon Skelly was not mentioned in Sprint's motion for partial summary judgment. (SC Resp. in Opp'n & Cross Motion, ECF No. 327, 52–53).

defendants will be denied. The motion for relief from restraining order by Wireless Buybacks, LLC will also be denied.

## BACKGROUND

The court assumes familiarity with the factual background of this case. In brief, this case centers on wireless telephones ("Sprint Phones") designed for use on Sprint's wireless service. Sprint makes these phones available to its customers at a subsidized rate but then recoups these subsidies through the accompanying sale of Sprint service, which the customer needs in order to, *inter alia*, make and receive phone calls and text messages. Sprint claims that the defendants traffic in stolen and fraudulently obtained Sprint Phones. (Sprint Mot. Partial Summ. J. 7–8, 11–14, ECF No. 317). Defendants concede that they sell Sprint Phones but claim they are legitimate participants in the secondary market for new and used Sprint Phones. (WB Resp. in Opp'n & Cross Mot. 20–24, ECF No. 339); (SC Resp. in Opp'n & Cross Mot. 9–13, ECF No. 327). Wireless Buybacks, for instance, claims it purchases Sprint Phones in bulk at auctions and directly from consumers, and then resells these phones for use on Sprint's network. (WB Resp. in Opp'n & Cross Mot. 12).

Sprint filed this action under sixteen legal theories.[2] Sprint now moves for summary judgment on the following claims: Breach of Contract (Count 1) against Wireless Buybacks LLC and Brendan Skelly; Conversion (Count 15) against all defendants;[3] Replevin (Count 16) against all defendants; Tortious Interference (Count 3) against all defendants; Unfair Competition

---

[2] Breach of Contract (Count 1); Unfair Competition (Count 2); Tortious Interference with Business Relationships and Prospective Advantage (Count 3); Civil Conspiracy (Count 4); Unjust Enrichment (Count 5); Conspiracy to Induce Breach of Contract (Count 6); Common Law Fraud (Count 7); Fraudulent Misrepresentation (Count 8); Trafficking in Computer Passwords (Count 9); Unauthorized Access (Count 10); Unauthorized Access with Intent to Defraud (Count 11); Federal Trademark Infringement (Count 12); Federal Common Law Trademark Infringement and False Advertising (Count 13); Contributory Trademark Infringement (Count 14); and Conversion (Count 15); Replevin (Count 16). (Compl., ECF No. 1).

[3] As previously noted, "all defendants" refers to all defendants named in Sprint's motion for partial summary judgment. Sprint does not mention Shannon Skelly, another defendant in the case, in that motion.

(Count 2) against all defendants; Unjust Enrichment (Count 5) against all defendants; and Conspiracy (Count 4) against all defendants. (Sprint Mot. Partial Summ. J. 9). The Wireless Buybacks defendants have responded and, in addition, defendants Skelly, Lowe, and Salkeld have cross moved for summary judgment on Sprint's contract claims, and defendant Salkeld has cross moved for summary judgment on Sprint's other statutory and tort claims. (WB Resp. in Opp'n & Cross Mot. 69–71). The Simple Cell defendants have also responded and, in addition, cross moved for summary judgment on all claims for which Sprint has moved for partial summary judgment against them. (SC Resp. in Opp'n & Cross Mot.). In addition, the Simple Cell defendants have moved for summary judgment on some claims for which Sprint did not seek summary judgment against them. In particular, the Simple Cell defendants have moved for summary judgment on the CFAA and trademark infringement claims. (*Id.*). Simple Cell's response and cross motion also requests summary judgment on all claims for Shannon Skelly, who is not mentioned in Sprint's motion for partial summary judgment. (*Id.* 47–53). Sprint has replied / responded to the filings from the Wireless Buybacks and Simple Cell defendants. (Sprint Reply/Response, WB Resp' in Opp'n & Cross Mot., ECF No. 345); Sprint Reply/Response, SC Resp. in Opp'n & Cross Mot., ECF No. 346). The Wireless Buybacks and Simple Cell defendants have replied in support of their cross motions. (WB Reply, Cross Mot. Summ. J., ECF No. 352; SC Reply, Cross Mot. Summ. J., ECF No. 354). In a separate filing, Wireless Buybacks also has objected to what it views as "new evidence" put forth by Sprint in connection with Sprint's Reply/Response. (WB Evidence Objection, ECF No. 353). Sprint has responded to this objection. (Sprint Resp. in Opp'n to WB Evidence Objection, ECF No. 356).

Finally, Wireless Buybacks, LLC has moved for relief from a Temporary Restraining

Order ("TRO") entered into on March 5, 2013. (WB Mot. Relief from TRO, ECF No. 292). Sprint has responded in opposition, (Sprint Resp. in Opp'n to WB Mot. Relief from TRO, ECF No. 295), and Wireless Buybacks has replied, (Reply, Mot. Relief from TRO, ECF No. 296).

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## **ANALYSIS**

I. Cross Motions for Partial Summary Judgment

Preliminarily, the defendants object to some of the evidence offered by Sprint, claiming it is inadmissible and should not be considered on summary judgment. The court will examine these objections before turning to the motion and cross motions for summary judgment.

   *A. Sprint's ESN Analysis*

Sprint alleges that the defendants traffic in stolen and fraudulently obtained Sprint Phones. During discovery, defendants produced purchase and sales records to Sprint, which included the Electronic Serial Numbers ("ESNs") of Sprint Phones that defendants had acquired and resold. (*See* Sprint Mot. Partial Summ. J. 8–9, Ex. A (First Breithaupt Decl.), ECF No. 301-1, Ex. 6). With respect to ESN data provided by Wireless Buybacks, Clint Breithaupt ("Breithaupt"), the senior fraud manager at Sprint, undertook several steps to analyze this data. First, he provided the ESNs to an analyst, Rene Shimel. (First Breithaupt Declaration ¶ 27). Shimel converted those ESNs into two different formats to optimize their usefulness for Sprint's search purposes. (*Id.* n.2). Shimel then plugged the converted ESNs (both formats) into three Sprint databases in order to retrieve information associated with the Sprint phones with those specific ESNs; that information included phone type and cost and customer account information. (*Id.*). Shimel compiled this information and placed it into a spreadsheet; Breithaupt took that spreadsheet and manually entered each ESN into Sprint's billing system to authenticate the data. (*Id.*). Breithaupt also removed all duplicate ESNs. (*Id.*, Ex. 7). Sprint performed a similar process with respect to ESNs obtained from Simple Cell defendants' purchasing and sales records. (*Id.* ¶ 30, Ex. 8). Finally, Sprint analyzed this data using certain assumptions, and incorporated the results in the spreadsheet. For instance, both spreadsheets – one for Wireless Buybacks, one for Simple Cell – contain a summary chart listing the numbers of phones that Sprint believes (based

on the underlying data) are associated with fraudulent activity. (*Id.* Exs. 7, 8). The numbers

based on fraudulent activity, in turn, are devised using certain assumptions. For instance, Sprint

lists as "stolen" all phones that were either "stolen" or "lost" because its database does not

distinguish between these two categories. (First Breithaupt Decl. ¶ 29). Similarly, Sprint

classified phones as acquired through "upgrade fraud" if they were ordered on a Sprint account

but not activated to that customer's account within 30 days. (First Breithaupt Decl. ¶ 16).

Sprint now seeks to introduce these two spreadsheets into evidence as "business records."

According to the Wireless Buybacks and Simple Cell defendants, these spreadsheets are

inadmissible "summaries" of information contained in the Sprint databases. They note that,

under Fed. R. Evid. 1006, a proponent may prove the content of "voluminous writings" by

submitting summaries but must make the originals or duplicates of the underlying documents

available for examination or copying by other parties. Because Sprint has not made the

underlying data on which its spreadsheets are based available, the spreadsheets are inadmissible,

the defendants claim. (*See* SC Resp. in Opp'n & Cross Mot. 17-21). Sprint concedes the

spreadsheets would be inadmissible under Rule 1006 but counters that the spreadsheets are

independently admissible "business records" under Rule 803(6). The court concludes these

spreadsheets are more properly classified as summaries and thus will not consider them.

Under Rule 803(6), a record is admissible as a "business record" if: (A) the record was

made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business,

organization, occupation, or calling, whether or not for profit; (C) making the record was a

regular practice of that activity; (D) all these conditions are shown by the testimony of the

custodian or another qualified witness, and (E) the opponent does not show that the source of

information or the method or circumstances of preparation indicate a lack of trustworthiness.

The business records exception is premised on the idea that documents prepared in the

ordinary course of business are presumed to be reliable. *Certain Underwriters at Lloyd's,*

*London v. Sinkovich*, 232 F.3d 200, 204-05 (4th Cir. 2000). By contrast, documents prepared in

anticipation of litigation are generally unreliable. See *id.* 204–05. Evidence that has been

extracted from an electronic database specifically for the purpose of litigation occupies a middle

ground: it may be admissible as a business record, but certain unique considerations apply. First,

admissibility turns on whether the underlying dataset from which the information is culled meets

the requirements of Rule 803(6). Accordingly, even information extracted from a database and

presented to the court in response to litigation may constitute a "business record." But the

proponent of such evidence must establish that the information in the underlying database was

originally amassed in compliance with Rule 803(6). *See Potamkin Cadillac Corp. v. B.R.I.*

*Coverage Corp.*, 38 F.3d 627, 632–33 (2d Cir. 1994); *United States v. Fujii*, 301 F.3d 535, 539

(7th Cir. 2002); *United States v. Nixon*, 694 F.3d 623, 634–35 (6th Cir. 2012); *U-Haul Int'l, Inc.*

*v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009). Second, if a proponent

queries a database in order to extract data that is responsive to ongoing litigation, the content of

responsive records generally must be presented with minimal alterations. Accordingly, courts

have suggested that computer printouts of electronically stored information are "business

records" but summaries or selective extractions of responsive data are not. *See Potamkin*, 38

F.3d at 633 (contrasting a simple data download with the "selection and interpretation of data");

*United States v. Sanders*, 749 F.3d 195, 199 (5th Cir. 1984) (contrasting a "retrieval of data"

with "a selective compilation of random pieces of data"); *United States v. Thomas*, 315 F. App'x 828, 836 (11th Cir. 2009) (contrasting "computer printouts" with spreadsheets created "after analyzing and reorganizing" the data);[4] *cf.* 2 McCormick On Evid. § 294 (7th ed.) ("reordering the data" contained in electronic records, such as by "customers or transactions," in response to litigation needs does not bar admission as "business record").

The two spreadsheets here fail to meet the standard for "business records." As an initial matter, the court is inclined to view the spreadsheets as summaries of relevant information rather than "business records" per se. As the Breithaupt testimony explains, the spreadsheets combine data from at least three different Sprint databases and have been edited to remove redundancies. The spreadsheets also contain "analysis" based on certain assumptions provided by Sprint. This is a far cry from a "computer printout." Yet even setting this issue aside, the court declines to admit these spreadsheets as "business records" because of the lack of information about how the underlying data was collected and maintained. To support its claims that the spreadsheets are "business records," Sprint relies entirely on the First Breithaupt Declaration, which provides no explanation of how the information in these databases is amassed. That does not suffice. *See Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 2011 WL 862729, at *5 (D. Md. Mar. 10, 2011) (a "qualified witness" for Rule 803(6) purposes is "one who can explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met"). The First Breithaupt Declaration clarifies that Sprint regularly conducts ESN analyses using these databases in order to investigate potential fraud. While that regular practice may provide some indication that the information in the databases is reliable, it does not suffice on its own. Sprint

---

[4] Unpublished opinions are cited for the soundness of their reasoning; they are not binding precedent.

may attempt to present these spreadsheets as Rule 1006 summaries, but the court will not consider them on summary judgment under the business records exception to the hearsay rule.

In the alternative, Sprint claims its spreadsheets are admissible under Fed. R. Evid. 807. But that "residual exception" applies only if a statement that would otherwise be excluded as hearsay "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3). Here, both parties appear to agree that the relevant evidence – the information contained in the spreadsheets – may be offered pursuant to Rule 1006 once Sprint makes the underlying data on which its analysis based available to all defendants. Indeed, Sprint has signaled a willingness to pursue this route if the spreadsheets are not admitted as "business records." (Sprint Reply/Response, WB Resp. in Opp'n & Cross Mot. 15).[5]

*B. First Breithaupt Declaration*

The defendants also ask this court to strike portions of the First Breithaupt Declaration that describe conversations between Sprint officials and certain individuals as inadmissible hearsay. The Simple Cell defendants urge the court to disregard or strike portions of the First Breithaupt Declaration that describe conversations Sprint had with a person (Diana LaFleur) and an entity (Katy Independent School District). (SC Resp. in Opp'n & Cross Mot. 21–22; First Breithaupt Declaration ¶ 53). The Wireless Buybacks defendants similarly urge the court to strike those parts of the First Breithaupt Declaration that contain inadmissible hearsay, although it does not specify which portions it finds objectionable. (WB Resp. in Opp'n & Cross Mot. 27).

---

[5] Simple Cell already has requested documentation regarding Sprint's ESN Analysis. In response, the magistrate judge in this case ordered Sprint to provide such documentation with respect to 10 ESNs selected by Simple Cell. However, the magistrate judge, citing Rule 1006, clarified that this ruling did not relieve Sprint "of any responsibility it may have under the Federal Rules of Evidence to produce or make available for inspection a complete set of the underlying documents at issue." (Docket Entry 274 at 2).

The court will assume, as Sprint does, that Wireless Buybacks objects to the portions of the First Breithaupt Declaration that refer to conversations between Sprint and Tiffany Kennedy and Breeden Mechanical, Inc. (First Breithaupt Decl. ¶ 54).

Sprint does not deny that the testimony at issue here constitutes hearsay. Rather, it contends the testimony from LaFleur, Kennedy, Katy Independent School District, and Breeden Mechanical, Inc. qualifies for either the "statements against interest" exception to the hearsay bar or, alternatively, as "business records." (Reply, WB Resp. in Opp'n & Cross Mot. 18-19); (Reply, SC Resp. in Opp'n & Cross Mot. 20-21). Neither exception applies here. The "statements against interest" exception applies only where a declarant is "unavailable," and to prove unavailability the proponent of the testimony must show, *inter alia*, a bona fide effort to procure a witness' testimony. *United States v. Wrenn*, 170 F. Supp. 2d 604, 607 (E.D. Va. 2001). Sprint offers no explanation for why Kennedy is an "unavailable declarant" and merely cites to the fact that Simple Cell defendants have been unable to contact LaFleur when discussing why LaFleur is an unavailable declarant. (Reply, SC Resp. in Opp'n & Cross Mot. 20). Similarly, the "business records" exception does not apply. To support its claim that this exception applies, Sprint relies on the second declaration from Clint Breithaupt (Reply, WB Resp. in Opp'n to Sprint Mot. Partial Summ. J. Ex. A, Second Breithaupt Decl., ECF No. 345-1). In that declaration, Breithaupt claims that Sprint agents took detailed notes of their conversations with Kennedy and LaFleur, and that such notetaking was standard business practice. (Second Breithaupt Declaration, ¶¶ 6–7). But Sprint fails to offer the actual "record" – those employee notes – that would be at issue here. Without a "business record" to examine, the exception does

not apply.[6] Thus, the court will not consider those portions of the First Breithaupt Declaration detailing conversations with LaFleur, Kennedy, Katy Independent School District, and Breeden Mechanical, Inc..

Wireless Buybacks additionally urges the court to strike the First Breithaupt Declaration in its entirety because Breithaupt allegedly "offers expert testimony on a variety of highly complicated and heavily disputed technical, financial, and specialized factual issues" yet "was never disclosed as an expert witness" and "has not produced any expert report" pursuant to Fed. R. Civ. P. 26(a)(2). (WB Resp. in Opp'n & Cross Mot. 27-28). Wireless Buybacks does not specify the particular "technical, financial, and specialized factual issues" to which it objects, but the court assumes – as Sprint does in its Reply – that Wireless Buybacks objects to damage estimates outlined by Breithaupt in his declaration. In relevant part, Breithaupt explains Sprint's estimation of expected revenue from each Sprint Phone and estimates damages due to trafficking by multiplying that figure by the number of trafficked phones. (First Breithaupt Declaration ¶¶ 18–21).

Under Fed. R. Evid. 701, lay opinion testimony must be "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Admission of opinion testimony from lay witnesses is generally favored "provided that it is well founded on personal knowledge . . . and susceptible to specific cross-examination." *MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990). Accordingly, company officials may estimate future profits or losses as a lay witness if the estimates are based on personal experience. *See Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017) (allowing employee to offer lay witness testimony on damages

---

[6] The court does not decide whether production of the underlying notes would be sufficient to demonstrate that the business records exception applies.

where the testimony was based on his "day-to-day work" at company); *Wanzer*, 897 F.2d at 706

(allowing employee to offer lay witness testimony on future profits where the testimony was

based on personal knowledge of company finances); *Von der Ruhr v. Immtech Int'l, Inc.*, 570

F.3d 858, 862 (7th Cir. 2009) ("In the realm of lost profits, lay opinion testimony is allowed . . .

where the witness bases his opinion on particularized knowledge he possesses due to his position

within the company."); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir.1993)

(upholding admission of lay opinion from plaintiff's owner as to damages, which was based upon

personal knowledge and participation in affairs of business); *see also* Fed. R. Evid. 701,

Committee Notes on Rules—2000 Amendment (noting that "most courts have permitted the

owner or officer of a business to testify to the value . . . of the business" as a lay witness

"because of the particularized knowledge that the witness has by virtue of his or her position in

the business").

    As senior fraud investigator, Breithaupt had personal knowledge of fraudulent activity

with respect to Sprint Phones and how those losses affected the company on a per-phone basis.

Accordingly, Breithaupt may testify as a lay witness on damages under Fed. R. Evid. 701.[7]

    *C. New Evidence*

    In a separate motion, the Wireless Buybacks defendants also separately object to what

they consider "new evidence and arguments" raised through Sprint's Reply, the Second

Breithaupt Declaration (which was attached to the Reply), and a third declaration from

---

[7] Wireless Buybacks further claims that Sprint's ESN databases are unreliable and that the spreadsheets submitted by Sprint analyzing data from these databases are similarly unreliable. Because the two spreadsheets do not meet the requirements for "business records," the court need not examine these arguments. Sprint and Wireless Buybacks also dispute whether the court can consider an expert report by Whitey Bluestein at this time. (WB Resp. in Opp'n & Cross Mot. Summ. J. Ex. B, ECF No. 335-3). The court will not consider those parts of the report already deemed inadmissible. (ECF No. 288). Further, because the report is unsworn, and Wireless Buybacks has done nothing to show that it can be put in admissible form, the court will not consider it at this time. See *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015).

Breithaupt that Sprint later independently submitted. (WB Evid. Mot.). In general, courts should not consider new arguments or new evidence raised for the first time in reply briefs, *see Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006), unless offered to rebut arguments specifically raised in an opposition, *see Allen v. Enabling Techs. Corp.*, 2016 WL 4240074, at *4, 11–13 (D. Md. Aug. 11, 2016) (new evidence).

First, the Wireless Buybacks defendants object to portions of the Second Breithaupt Declaration related to trademark claims and alleged violations of the CFAA – which were not included in Sprint's partial summary judgment motion against the Wireless Buybacks defendants. Sprint clarified in its response that those portions are applicable only to the Simple Cell defendants. (Sprint. Resp. in Opp'n to WB Evid. Objection 3, ECF No. 356). Thus, the court agrees this is a non-issue and will not consider these portions in the context of summary judgment motions between Sprint and the Wireless Buybacks defendants.[8]

Second, the Wireless Buybacks defendants claim the Sprint Reply "asserts entirely new conspiracy claims" against them based on their alleged interactions with Mr. Sergio Tijerina. (WB Evidence Objection 4, ECF No. 353). The Reply, they note, alleges that unlawful acts by Wireless Buybacks defendants and their co-conspirators include "hacking into Sprint's computer system" – which Sprint alleges was performed by Tijerina. (Sprint Reply/Response, WB Resp' in Opp'n & Cross Mot. 12). But in its original motion for partial summary judgment, Sprint does not claim that the Wireless Buybacks defendants and Tijerina were involved in a conspiracy that

---

[8] The Wireless Buybacks defendants also suggest that Sprint uses the "new evidence" related to trademark claims contained in the Second Breithaupt Declaration as "leverage" in support of its request for injunctive relief in its Reply brief. This appears to relate to a single citation in a section of the Reply related to Sprint's request for injunctive relief. (ECF No. 346, 53). To clarify, the court will not consider alleged trademark claims when deciding whether injunctive relief is appropriate vis-à-vis the Wireless Buybacks defendants.

involved hacking: indeed, the original motion contains only a passing reference to Tijerina in the context of the alleged upgrade subsidy fraud. (Sprint Mot. Partial Summ. J. 35).

Sprint claims it may now offer evidence that Tijerina was a co-conspirator who illegally hacked into Sprint's systems, for two reasons. First, it offers this evidence to undermine the notion that Wireless Buybacks took strong measures to ensure the phones it sold were not stolen. Second, it offers the evidence in order to prove that Sprint has established the elements of its conspiracy claim. (Sprint Resp. in Opp'n to WB Evid. Mot. 4).

The court will consider the evidence related to Tijerina and included in Sprint's Reply in the context of its first purported use, but not the second. Sprint may offer this evidence to rebut the assertion by Wireless Buybacks that it does not sell stolen phones in part because it "rigorously checks" the ESNs of its phones to ensure they are not stolen before sale. (WB Resp' in Opp'n & Cross Mot. 13). This issue was raised by the Wireless Buybacks defendants in its opposition. But Sprint cannot fundamentally alter its conspiracy arguments in its Reply to suggest that Tejerina was a co-conspirator who hacked into Sprint's systems. The court will disregard the evidence insofar as it relates to this new conspiracy argument.

Third, the Wireless Buybacks defendants object to the Third Breithaupt Declaration, which Sprint filed four months after filing its motion for partial summary judgment. (Third Breithaupt Decl., ECF No. 351). The declaration and its accompanying data purport to establish conclusively Sprint's ownership interest in phones that were subsequently found in possession of Wireless Buybacks by showing that these phones were stolen directly from Sprint's warehouse or a Sprint-owned retail store – that is, a Sprint customer did not acquire a possessory interest by purchasing them from Sprint before they were stolen. (Third Breithaupt Decl. ¶ 5). This evidence

was not disclosed during discovery; for that reason, the parties agree that its consideration is guided by Fed. R. Civ. P. 37(c)(1) and the factors outlined by the Fourth Circuit in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). The two sides also dispute whether the new evidence is an admissible business record.

Fed. R. Civ. P. 37(c)(1) provides for the exclusion of evidence that is not disclosed in accordance with Fed. R. Civ. P. 26. In particular, Rule 37(c)(1) provides that a party that fails to disclose information is not permitted to use that information as evidence on a motion unless the failure to disclose is substantially justified or harmless. Thus, Rule 37(c)(1) could prevent a moving party in a summary judgment proceeding from offering evidence to support its claims when that party has previously failed to meet its disclosure and duty to supplement requirements. Excluding evidence as a sanction for non-disclosure supports the basic purpose of Rule 37(c)(1), which is to prevent surprise and prejudice to an opposing party. *Southern States*, 318 F.3d at 596.

In *Southern States*, the Fourth Circuit set out a five-factor test to determine if non-disclosure was substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." 318 F.3d at 597. The non-disclosing party bears the burden to establish that nondisclosure was justified or harmless. *Id.* at 596. District courts have "broad discretion" to decide whether a nondisclosure is substantially justified or harmless, and they are not required to examine all of the factors outlined by *Southern States*. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

Accordingly, the court will not strike the evidence submitted with the Third Breithaupt

Declaration at this time, although it declines to consider it on summary judgment. On the one hand, the failure to disclose does not appear to be substantially justified. Sprint commenced this suit over four years ago, and the only explanation it provides for why it advances this evidence now – after the close of discovery and before a responsive pleading from Wireless was due – was that it took a significant amount of time to extract it from Sprint's computer network. (Second Breithaupt Decl. 6-7). On the other hand, the evidence is critical to Sprint's conversion/replevin claims, and there is no issue curing any "surprise" prior to trial, as trial has not been yet scheduled. In this circumstance, the court will not consider the evidence on summary judgment but will not exclude the evidence moving forward. *See, e.g.*, *Fields v. Allstate Corp.*, 2012 WL 1792639, at *3 (D. Md. May 15, 2012) (declining to strike under Fed. R. Civ. P. 37(c)(1) where failure to disclose could be cured, there was no trial disruption, and the evidence was important to plaintiff's case). Such an approach is consistent with several cases in this circuit that have weighed the *Southern States* factors and not automatically excluded non-disclosed evidence. *See Mayor & City Council of Baltimore v. Unisys Corp.* 2013 WL 4784118, at *5 (D. Md. Sept. 5, 2013) (listing cases).

<u>Count 1: Breach of Contract</u>

Sprint has moved for summary judgment on its breach of contract claim against the Wireless Buybacks defendants, claiming the undisputed evidence shows Wireless Buybacks and Brendan Skelly breached their contract with Sprint by failing to pay monthly service charges and early termination fees for 667 phones they had ordered. (Sprint Mot. Partial Summ. J. 24). Sprint has not moved for summary judgment against the Simple Cell defendants on this issue. However, the Simple Cell defendants have moved for summary judgment against Sprint, claiming they

never entered into a contract with Sprint and thus cannot be liable for breach. (SC Resp. in Opp'n & Cross Motion 22).

A. Wireless Buybacks

Wireless Buybacks and Brendan Skelly opened three Sprint accounts in June 2011. ("Wireless Buybacks Accounts"). (First Breithaupt Decl. ¶¶ 32–41; Sprint Mot. Partial Summ. J. Ex. A, Ex. 9). Through these accounts, they ordered 667 new Sprint phones and, in the process, agreed to a service contract and the accompanying Terms & Conditions. (First Breithaupt Decl. ¶ 37; Sprint Mot. Partial Summ. J. Ex. A, Ex. 10). On two accounts, Wireless Buybacks and Skelly never made any payments; on the third, they made a payment of $20,000. (Sprint Mot. Partial Summ. J. Ex. A, Exs. 10, 11). Sprint sent invoices for outstanding payments, (Sprint Mot. Partial Summ. J. Ex, A, Ex. 11), and when payments were not received, Sprint sent letters to Skelly on July 18, 2011, advising him that, absent compliance with the Terms & Conditions, the accounts would be cancelled, (*id.* ex. 12). Sprint sent further "reminders" regarding non-payment in August and September 2011. (Sprint Reply to WB Resp. in Opp'n, Ex. C, ECF No. 345-3). The accounts were eventually terminated, and Sprint never got its phones back. (Sprint Mot. Summ. J. 16). The accounts were assigned to Enhanced Recovery Company, LLC for collection efforts, which contacted Wireless Buybacks regarding continued non-payment in 2013. (Sprint Reply/Response, WB Resp' in Opp'n & Cross Mot. Ex. C).

Rather than dispute these basic facts, the Wireless Buybacks defendants claim that Sprint 1) waived its right to recovery monetary damages, 2) is estopped from seeking damages, and 3) is precluded from recovering damages because Sprint independently breached the contract. The defendants also dispute the amount of damages that Sprint claims it is owed.

According to the Wireless Buybacks defendants, Sprint waived the right to monetary relief because Sprint elected, "as its sole remedy for this alleged breach, to cancel the contracts in 2011 and did not demand any monetary payment from Wireless Buybacks at that time or anytime thereafter." (WB Resp. in Opp'n & Cross Mot. 30). They note that, in letters sent by Sprint to Wireless Buybacks in July 2011, Sprint alleged Wireless Buybacks had breached its contract but never demanded any payments. (*Id.* Ex. A, Skelly Decl. ¶¶ 22-23, ECF No. 335-2). Sprint also never asked Wireless Buybacks to return 667 Sprint Phones. "By not demanding the phones back, Sprint mislead [sic] Wireless Buybacks into believing that Sprint did not intend to seek recovery of the phones and that Wireless Buybacks could dispose of the phones in any manner it saw fit," including by selling them to others. (*Id.* ¶ 23).

Parties to a contract may, by their conduct, waive contractual requirements. *Myers v. Kayhoe*, 391 Md. 188, 205 (2006). Waiver is "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Id.* The intent to waive a contractual provision "must be clearly established and will not be inferred from equivocal acts or language." *Id.* Here, no rational trier of fact could conclude that Sprint intended to waive its right to collect payment. Although Sprint did not demand payment in the July 2011 letters, it subsequently contacted Wireless Buybacks and demanded payment. And, as Sprint notes, the relevant contract contains a non-waiver clause stating that, even if Sprint "waives or doesn't enforce a requirement under this Agreement in an instance, we don't waive our right to later enforce that requirement," and that rights such as those "relating to billing" and "payment" "survive the termination of the Services." (Sprint Mot. Partial Summ. J., Ex. A, Ex. 3, 11). Wireless Buybacks has not produced

evidence that Sprint intended to waive this non-waiver provision either, so its claim fails. *See Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 559 (4th Cir. 2015).

Wireless Buybacks also claims Sprint is estopped from recovering damages due to a contract breach because Sprint never sought to recover the phones it had provided to Wireless Buybacks. (WB Resp. in Opp'n & Cross Mot. 31–32). This inaction, the defendants claim, led Wireless Buybacks to believe it could resell its phones. (Id. 32). Pursuant to an estoppel theory, "[a] party asserting the benefit of an estoppel must have been misled to his injury and have changed his position for the worse, having believed and relied on the representations of the party sought to be estopped." *Creveling v. Gov't Employees Ins. Co.*, 376 Md. 72, 102 (2003) (internal quotation marks omitted). Here, Wireless Buybacks bears the burden of proving the facts that support its claim of equitable estoppel. *See id.* ("The party arguing for an estoppel bears the burden of proving the facts that create it."). Wireless Buybacks has not provided evidence showing that it was misled by Sprint and changed its position as a result. At most, it offers the conclusory assertion that, if Sprint had demanded its phones, Wireless Buybacks would have returned them. That bare assertion alone does not suffice.

According to Wireless Buybacks, Sprint also cannot recover because it failed to invoice Wireless Buybacks for non-payment of so-called Early Termination Fees (ETFs). Thus, recovery is precluded under waiver or estoppel, or because Sprint itself has breached the contract. (*See* WB Resp. in Opp'n & Cross Mot. 32-33). Under the contracts, ETFs apply when a customer terminates a line of service before the applicable term commitment (here, two years) concludes or when Sprint terminates service early for "good reason," which includes termination for non-payment. (*See* Sprint Mot. Partial Summ. J. Ex. A, Ex. 3 at 4) ("You will be charged a fee

("Early Termination Fee") for each line of Service that . . . we terminate early for good reason (for example, violating the payment or other terms of the Agreement)"). According to Wireless Buybacks, Sprint "never invoiced Wireless Buybacks for or demanded payment of" these ETFs. (WB Resp. in Opp'n & Cross Mot. Ex. A, ¶ 22). For that reason, Wireless Buybacks claims it is not liable for paying these ETFs, both under waiver and estoppel theories and because the failure to invoice is an independent contractual breach by Sprint. (*Id.* 32-33). The waiver theory fails in light of the non-waiver provision discussed above and the failure by Wireless Buybacks to show that Sprint intended to waive this provision. The estoppel theory fails because, even if Sprint never billed for the ETFs, Wireless Buybacks has not shown this alleged "representation" led to a "prejudicial change" of its conduct. *See Creveling*, 376 Md. at 102. Alternatively, Wireless Buybacks claims Sprint cannot recover because it breached the terms of the contract by not invoicing Wireless Buybacks for ETFs. The court fails to see – and Wireless Buybacks fails to explain – how the contract at issue here creates such an obligation.[9]

Finally, Wireless Buybacks claims Sprint cannot recover compensatory damages because the contract to which Wireless Buybacks and Sprint agreed contained a liquidated damages provision that serves as the sole remedy for Sprint's claims. (WB Resp. & Cross Mot. 33). To support its liquidated damages claim, Wireless Buybacks relies on language appearing under the header, "Your Right to Terminate Services." That language clarifies that, if a Sprint customer elects to terminate Services early, that customer is "responsible for all charges billed or incurred prior to deactivation" and, if subject to an ETF, "must also pay the invoiced Early Termination

---

[9] Wireless Buybacks appears to base its argument on one line in the contract stating that, if a Sprint customer chooses to terminate services early, and that customer is subject to an ETF, then the customer "must . . . pay the *invoiced* Early Termination Fee" for each line of Service terminated early. (Sprint Mot. Partial Summ. J. Ex. A, Ex. 3 at 5) (emphasis added). This does not create a contractual obligation to send invoices to Wireless Buybacks. It is not even clear this provision is relevant here, because Sprint – not Wireless Buybacks – initiated the termination.

Fee for each line of Service" the customer terminates before the expiration of the applicable term commitment. (Sprint Mot. Partial Summ. J. Ex. A, Ex. 3 at 5). According to Wireless Buybacks, this operates as a liquidated damages provision: Sprint cannot recover more than the amount of outstanding damages and unpaid ETFs. Sprint, by contrast, claims the ETF provision "functions as an alternative method of performance rather than a liquidated damages provision." (Sprint Reply/Response, WB Resp' in Opp'n & Cross Mot., 28-29).

A contract with alternative methods of performance is one that was intended to give a promisor a true option: at the time for performance, either method of performance might prove to be more desirable. *See Carlyle Apartments Joint Venture v. AIG Life Ins. Co.*, 333 Md. 265, 276-77 (1994); *see also Doral Bank PR v. Fed. Home Loan Mortg. Corp.*, 477 F. App'x 31, 38 (4th Cir. 2012) (liquidated damages provision differs from an alternative performance contract principally because the former is agreed upon in advance by the parties as a remedy for breach). Here, Wireless Buybacks had a true choice with respect to performance: it could either pay monthly charges for two years or pay a one-time ETF in order to avoid those charges. For that reason, the ETF is not construed as a remedy for breach. *See Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1184 (W.D. Wash. 2010) (finding ETFs are not liquidated damages).

For the foregoing reasons, the court concludes that Wireless Buybacks is liable for breach of contract. However, the court declines to rule at this time on the amount of damages for which Wireless Buybacks is liable in light of the many issues Wireless Buybacks has raised with respect to the amount of damages and whether they have been determined with reasonable certainty. (See WB Resp. in Opp'n & Cross Mot. Partial Summ. J. 60 – 66). The court also declines to grant Sprint's request for injunctive relief at this time.

B. Simple Cell

Sprint did not originally move for summary judgment against the Simple Cell defendants on the basis of breach of contract, but the Simple Cell defendants have moved for summary judgment on this issue against Sprint. They claim they are entitled to summary judgment because they "never entered into a contract with Sprint." (SC Resp. in Opp'n & Cross Mot. 22). In response to this cross motion for summary judgment, Sprint has put forth evidence purporting to show that the Simple Cell defendants did, in fact, purchase phones directly from Sprint. As a result, Sprint now asks the court to amend its pleadings and enter summary judgment in its favor. (Sprint Reply/Response, SC Resp. in Opp'n & Cross Mot. 54-55).

The court will first address the Simple Cell defendant's motion for summary judgment. To support its claim, the Simple Cell defendants offer an affidavit by Metzger stating that none of the Simple Cell defendants "have a contract with Sprint," nor have any of them "ever signed or agreed to any of Sprint's Terms and Conditions." (ECF No. 324, Metzger Declaration, ¶ 31). In response, Sprint has offered evidence – including purported PayPal records, credit card statements, and Sprint internal account memos – in an attempt to show the Simple Cell defendants have purchased phones from Sprint. (Second Breithaupt Decl. ¶ 33; ECF No. 345-1, Exs. 14, 16-17; ECF No. 346 Ex. K). That evidence is more than sufficient to create a genuine dispute of material fact, and the court will thus deny Simple Cell's motion.

The court also will deny Sprint's belated request for summary judgment on this issue. Sprint appears to concede that its complaint did not allege that the Simple Cell defendants breached a contract with Sprint. (Sprint Reply, SC Resp. in Opp'n & Cross Mot. 54 n.25). Although this does not necessarily bar the court from examining issues subsequently raised on in

the summary judgment context, *see People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367–68 (4th Cir. 2001), the Fourth Circuit has cautioned against amending pleadings unless issues were "tried by express or implied consent of the parties." Here, the Simple Cell defendants clearly object. Sprint also did not move for summary judgment on this issue against the Simple Cell defendants in its original summary judgment brief. For those reasons, the court will not entertain Sprint's request for summary judgment on this issue.

Count 3: Tortious Interference

Sprint alleges tortious interference based on the fact that Wireless Buybacks purchases phone upgrades from Sprint customers. (Sprint. Mot. Partial Summ. J. 20). In particular, Sprint allows customers to upgrade their Phones at a discounted rate in exchange for the customers' agreement to stay on Sprint's wireless service for an additional period of time. (First Breithaupt Decl. ¶ 45). There are two forms of tortious interference in Maryland: "inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Blondell v. Littlepage,* 991 A.2d 80, 97 (Md. 2010). These will be examined in turn.

A. Wireless Buybacks

1. Tortious Interference with Contract

In Maryland, "[t]he elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff." *Fraidin v. Weitzman,* 93 Md. App. 168, 611 A.2d 1046, 1057 (1993). Here, there is no genuine dispute of material fact with respect to whether a

23

contract existed between Sprint and its customers, and whether Wireless purchased phone

upgrades from Sprint customers. (*See* WB Resp. in Opp'n & Cross Mot. Summ. J. Ex. A,

Brendan T. Skelly Decl. ¶ 5 ("Wireless Buybacks . . . purchas[es] phones from consumers who

no longer desire their phones . . . . Wireless Buybacks buys phones that are intended to be placed

on the carrier networks of multiple carriers including Sprint."); *see generally* Sprint Mot. Partial

Summ. J. Ex. F. But Sprint and the Wireless Buybacks defendants dispute whether the latter's

conduct amounts to tortious interference.

a. Breach of Contract

The parties first contest whether Sprint customers who sold upgrades to Wireless

Buybacks breached the terms of their contract with Sprint. If there was no breach, then Wireless

Buybacks is not liable for tortious interference with contract.

The issue of breach centers on two provisions in the contract. The first states, "You [the

customer] cannot in any manner resell the Services to another party." (Sprint Mot. Partial Summ.

J. Ex. A, Ex. 3, 11). In a separate section entitled Basic Definitions, the contract defines the term

"Service" to include "Devices on your account with us," and it further defines the term "Device"

as including Sprint phones. (*Id.* 4). Arguing that this provision is ambiguous, Wireless claims

this definition of "Service" – i.e., that it includes "Devices" – is "counterintuitive to what

reasonable consumers would assume." (WB Resp. in Opp'n & Cross Mot. 43). Even if true, that

is irrelevant: "When a policy defines a term in a manner which differs from the ordinary

understanding of that term, the policy definition controls." *Valliere v. Allstate Ins. Co.,* 324 Md.

139, 142 (1991). The contractual definition of "Service" includes Sprint Phones, and the contract

states that Sprint customers may not resell phones "on [their] account with [Sprint]."

Wireless also claims the contract is ambiguous because it is not clear which Sprint phones are "on [a customer's] account with [Sprint]." Wireless claims the court cannot ignore this phrase and, to give it meaning, must find that customers may resell Sprint phones that are not "on [their] account with Sprint," meaning phones not yet activated on the Sprint network. (WB Resp. in Opp'n & Cross Mot. 44–45) (citing *Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524 (10th Cir. 2016)).[10] Sprint, by contrast, claims that "on your account with us" is not limited to phones that have been activated, for two reasons. First, Sprint notes that a "Device" is defined as "any phone . . . we provide you, we sell to you, or is active on your account with us." (Sprint Reply/Response, WB Resp' in Opp'n & Cross Mot. 37). Although this disjunctive "or" indicates that "Devices" includes both activated and non-activated phones, it does little to clarify whether the resale ban only applies to activated devices. Second, a separate provision of the contract states that Sprint "rate plans, *customer devices*, services and features are not for resale." (Sprint Mot. Partial Summ. J. Ex. A Ex. 3, 1) (emphasis added). According to Sprint, this provision further clarifies that the contract bars the resale of all Sprint phones. The term "customer devices" is not defined in the contract. On its own, then, this second provision may be ambiguous. But the court must "look to the entire language of the agreement, not merely a portion thereof" when interpreting a contract in order to determine the intention of the parties. *See Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008); *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985). Doing so here, and considering these separate provisions together, the court concludes the contract is not ambiguous and that the

---

[10] Wireless further claims that summary judgment is inappropriate because the record does not show which Sprint phones were "active on [a consumer] account" with Sprint when acquired by Wireless. (*Id.* 45).

parties intended to bar the resale of all Sprint phones, regardless of whether they have been activated on the Sprint network.[11][12]

### b. Intentional Interference

Next, Wireless and Sprint dispute whether Wireless knew of the contract between Sprint customers and Sprint and, if so, whether Wireless intentionally interfered with that contract. According to Wireless, the company "has never encouraged any Sprint customers to breach their contract or otherwise terminate their services with Sprint." (Brendan T. Skelly Decl. ¶ 9). With respect to interactions with Ms. Kennedy in particular, Wireless Buybacks claims it was approached by Ms. Kennedy and agreed to buy phones from her that Ms. Kennedy had said were not under contract with any carrier. (*Id.* ¶ 33). To support its assertions, Wireless also submits email correspondence between Brendan T. Skelly and Ms. Kennedy in which the two individuals discuss sales of phones and payments. (WB Resp. in Opp'n & Cross Mot. Summ. J. Ex I, ECF No. 335-10). According to Wireless, these records help show Wireless did not induce Sprint customers to breach their contracts because they demonstrate that 1) Brendan T. Skelly and Ms. Kennedy did not correspond until June 2012, despite Kennedy's assertion (in her affidavit) that Wireless reached out to her earlier that year, and 2) that Kennedy was the driving force behind these sales and that Wireless Buybacks did not, as Sprint claims, convince her to sell phones acquired on the Breeden Mechanical account. (WB Resp. in Opp'n & Cross Mot. 48–49).

---

[11] It is also undisputed that Sprint customers breached their contracts by selling phones to Wireless. For example, it is not disputed that Ms. Kennedy sold phones to Wireless even though the contract between her employer and Sprint prohibited the resale of such phones. Although Wireless claims it did not know these phones were under contract with Sprint, the fact that these phones were resold to Wireless is not disputed. (*See* WB Resp. in Opp'n & Cross Mot. Summ. J. Ex. A, ECF No. 335-2, ¶¶ 32–35).

[12] The current dispute also involves phones subject to Sprint's lease agreement or Sprint's installment billing agreement. These contracts clearly bar the resale of Sprint phones – which Wireless appears to concede. (Sprint Reply, WB Resp. in Opp'n & Cross Mot. 37–38).

By contrast, Sprint has submitted evidence showing Wireless sought out and purchased phones from Sprint customers even while knowing such purchases violated the contractual obligations to which Sprint customers had agreed. First, it submits email correspondence indicating that Wireless purchased phone upgrades from Sprint customers in particular. (*See* Sprint Mot. Partial Summ. J. Ex. F 17–19) (discussing the purchase of Sprint Phones for which corporate accounts have become eligible). *See also id.* Ex. Q 144:5–145:3, 150:3–151:2) (Lowe explaining that Linq refers customers to Wireless who want to sell their phone upgrades). It also submits evidence indicating that Wireless officials knew these purchases may conflict with contractual provisions obligating Sprint customers to be activated on that customer's account. (*See* Sprint Mot. Partial Summ. J. Ex. F at 8–12) (Brendan Skelly discussing requirement that Sprint phones be activated on the same business account that purchased them within 60 days and stating to Kevin Lowe, "It doesn't scare me" because "there is no way they are going to keep track of the devices for 60 days" and noting some ambiguities may exist); *id.* Ex. Q at 276 – 285 (Kevin Lowe deposition discussing that email exchange with Brendan Skelly); (*id.* Ex. S, Vol. I, 289:9–292:7) (Brendan Skelly acknowledging that Sprint requires renewal of a service contract when it provides an upgraded phone to a Sprint customer); (*id.* Ex. 3) (Sprint contract). Sprint also submits a text message in which Brendan Skelly appears to tell a Sprint customer that the customer can resell Sprint phones notwithstanding any assertions to the contrary by Sprint. (*Id.* Ex. jj at 8). Finally, Sprint submits an affidavit from Ms. Kennedy in which she claims Brendan T. Skelly contacted her in January 2012 and offered to buy new iPhones from her that she ordered through her employer's corporate account. *Id.* Ex. G.[13] Taken together, this evidence –

---

[13] Sprint also submits what it claims is a text message from Kevin Lowe to Brendan Skelly stating, "I guarantee 80% of consumers have no idea that technically they cannot sell their phone. Trust me sprint does not want this going

coupled with the declaration from Clint Breithaupt, First Breithaupt Declaration ¶ 47, suffices to show that Wireless knew that Sprint customers had a contract with Sprint prohibiting them from reselling phones to Wireless, and that Wireless sought out these phone upgrades anyway, thereby inducing Sprint customers to sell their phones to Wireless Buybacks.

Finally, the two sides dispute whether Sprint was damaged by Wireless buying phone upgrades from Sprint customers. Through the Second Breithaupt Declaration, Sprint presents evidence that the resale of Sprint phones by its customers to Wireless Buybacks harms Sprint because it hinders Sprint's objective of regularly migrating customers to newer devices that work more effectively on Sprint's network. And absent this regular migration, Sprint customers may grow dissatisfied because their devices "may no longer work on Sprint's network," it claims. (Second Breithaupt Dec. 4). In addition, it claims that customers who had their upgrades sold to Wireless Buybacks without their knowledge "no longer have the ability to upgrade their phone if it breaks, and may blame Sprint." *Id.* In response, Wireless Buybacks makes two claims. First, it questions whether Sprint incurred as much harm as it alleges. (*See* WB Resp. in Opp'n & Cross Mot. Summ. J. 52) ("Sprint offers no evidence to support its assertion that *each* customer involved in Wireless Buybacks' upgrade program did not fulfill the full term of their respective contracts.") (emphasis added)). Second, Wireless speculates that Sprint was not harmed because the phones sold by Wireless "must have been later activated on Sprint's network subject to Sprint's standard service contract," which would have conferred a benefit on Sprint. (*Id.*). Even taken together, this is not enough to create a genuine issue as to whether Sprint was harmed. The former contention speaks to the extent to which Sprint was harmed – not the existence of the

---

public." (Sprint Reply to WB Resp' in Opp'n & Cross Mot. 43 & Ex. F). However, the actual exhibit submitted to the court appears to contain only a truncated version of this text message.

harm itself. And speculation does not overcome a summary judgment motion. *See Bouchat*, 346

F.3d at 522 (unsupported speculation not enough to avoid summary judgment).

### 2. Tortious Interference with Business Relationships

In Maryland, a plaintiff "may claim tortious interference with a contract, or, in the

absence of a contract or breach of contract, [the plaintiff] may claim tortious interference with

business or economic relations." *D.C. Mason Builders, Inc. v. Bancroft Const. Co.*, 2015 WL

4040415, at *5 (D. Md. June 30, 2015). Because Sprint has shown tortious interference with

contract, the court need not examine this alternative claim with respect to Wireless Buybacks.

### B. Simple Cell

#### 1. Tortious Interference with Contract

Sprint and the Simple Cell defendants have filed cross motions for summary judgment

with respect to tortious interference with contract. The court denies both motions due to the

genuine issues of material fact at issue. Although Sprint claims that Simple Cell solicits company

upgrades through a so-called Capital Generation Program (Sprint Mot. Partial Summ. J. Ex. F),

Simple Cell has submitted evidence (in the form of a declaration from defendant Christopher

Metzger) that it never implemented that program, (Sprint Mot. Summ. J. Ex. W 201–202) ("[W]e

never actually did do this."). Similarly, although Sprint claims Simple Cell induced an

individual, Diana LaFleur, to breach her contract with Sprint and supply phones to Simple Cell,

Metzger claims Simple Cell never solicited phones from her, (Sprint Mot. Partial Summ. J. Ex.

W 216:15-16) ("We had no solicitation to Diana to use the upgrades of her school district.").

There is evidence that Simple Cell did business with LaFleur (Sprint Mot. Partial Summ. J. Ex.

A ¶53 & Ex. 13) (transaction log of payments), but there is no evidence that Simple Cell induced

LaFleur to breach her contract. Thus, the cross motions will both be denied.

### 2. Tortious Interference with Business Relationships

The court will also deny summary judgment with respect to tortious interference with business relationships with respect to the Simple Cell defendants. "To establish tortious interference with business relationships, a plaintiff must prove (1) intentional and willful acts, (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting. *Secure Identity Sols., Inc. v. Maxwell*, 2014 WL 6065964, at *3 (D. Md. Nov. 12, 2014). For similar reasons as stated above, the cross motions for summary judgment will be denied.

### Counts 15: Conversion & Count 16: Replevin

In Maryland, the common law tort of conversion contains two elements. First, the plaintiff must prove the defendant exerted "any distinct ownership or dominion ... over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym,* 841 A.2d 828, 835 (Md.2004) (quotation omitted). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* Second, the defendant must have "an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 836. Under a replevin theory, a plaintiff can similarly recover "personal property that is wrongfully detained by the defendant." *Ganter v. Kapiloff,* 516 A.2d 611, 612 (Md. App. 1986); *see also McClung–Logan Equipment Co. v. Thomas,* 172 A.2d 494, 498 (Md.1961) ("[I]n order to maintain an action of replevin the plaintiff must prove his right to immediate possession

at the time the writ issues.").

Sprint initially based its conversion claim on its analysis of ESNs provided by Wireless and Simple Cell. After analyzing the ESNs of the phones contained in defendants' purchase and sales records, it concluded that defendants had possessed over 50,000 "stolen" Sprint phones. Sprint explained that it categorized as "stolen" all phones that fell into one of several categories – such as "Stolen/Burglary/Lost" – and that its database did not distinguish between phones that had been lost and those that had been stolen. (Sprint Partial Summ. J. Mot. 30 & n.16); (Sprint Reply, WB Resp. in Opp'n & Cross Mot. Summ. J. 22–23). Sprint also claims it is entitled to recover for those Sprint phones that defendants have possessed and which were subject to lease or installment billing contracts. (Sprint Reply, WB Resp. in Opp'n & Cross Mot. Summ. J. 31).

In response, Wireless raised two objections. First, it claimed that once Sprint sells a phone to a customer, it no longer has a possessory interest in that phone such that it could recover under a conversion/replevin theory. (WB Resp. in Opp'n & Cross Mot. Summ. J. 34–38). Second, Wireless noted that Sprint's analysis is unable to distinguish between "lost" and "stolen" phones, and that this failing precludes summary judgment. (*Id.* 38–39). In essence, then, Wireless claimed that Sprint must show that the phones in the possession of defendants were actually stolen from Sprint – not sold by a Sprint customer. (*See id.*).

Sprint appears to concede the point that it no longer has a possessory interest in phones initially sold to a Sprint customer. (See Sprint Reply, WB Resp. in Opp'n & Cross Mot. 30–32). But it now attempts to prove that phones in defendants' possession were stolen directly from Sprint. With respect to Simple Cell, it attached evidence to its Reply purporting to show that 29 phones identified in the Simple Cell ESN Analysis were stolen directly from Sprint. (Second

Breithaupt Decl. & Ex. 2). With respect to Wireless Buybacks, it submitted the Third Breithaupt Declaration and accompanying data, (Third Breithaupt Decl.), purporting to show that 4,393 Sprint Phones were stolen directly from Sprint and ended up in the possession of Wireless. In addition, the data purports to show that Wireless possessed 100 stolen lease Phones and 707 stolen installment billing Phones. (Third Breithaupt Decl. ¶ 4–6 & Ex. 1).

Sprint's request for summary judgment on the conversion/replevin claims against the Wireless Buybacks defendants and the Simple Cell defendants will be denied, because these claims rest on evidence that the court has decided not to consider on summary judgment. In particular, it relies on the ESN Analyses that are not admissible as business records but may later come before the court as summaries, and it relies on the Third Breithaupt Declaration and accompanying data, which was not disclosed during discovery. The cross motion by Simple Cell for summary judgment is also denied in order to allow further development of the record.

### Count 2: Unfair Competition

Maryland defines unfair competition as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances ... [with] the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Trimed, Inc. v. Sherwood Med. Co.,* 977 F.2d 885, 891 (4th Cir. 1992) (quoting *Balt. Bedding Corp. v. Moses,* 182 Md. 229, 34 A.2d 338, 342 (Md.1943)). Allegations of fraud and deception commonly underlie claims of unfair competition, although they are not strictly required. *See, e.g., Mascaro v. Snelling & Snelling of Balt., Inc.,* 250 Md. 215, 243 A.2d 1, 10 (1968) ("As the law [of unfair competition] developed, proof of fraudulent

deception was no longer essential for relief."). To prevail on an unfair competition claim, a plaintiff must prove that the alleged misconduct "damaged or jeopardized" its business. *Berlyn Inc. v. The Gazette Newspapers, Inc.,* 73 F. App'x 576, 585 (4th Cir.2003). An act of practice constitutes unfair competition likely only if it "substantially interferes with the ability of others to compete on the merits of their products or otherwise conflicts with accepted principles of public policy." *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 692–93 (D. Md. 2012).

　　　　With respect to Wireless Buybacks and Simple Cell, the court will deny Sprint's request for summary judgment on unfair competition. Sprint's claims on unfair competition are based on its ESN Analysis – which the court does not consider here – and the accompanying First Breithaupt Declaration. (See Sprint Reply/Response, WB Resp. in Opp'n & Cross Mot. Summ. J. 46); (*See* Sprint Reply/Response, SC Resp. in Opp'n & Cross Mot. Summ. J. 33). But the data on which Sprint primarily relies is not properly before the court at this time. Further, there are genuine disputes of material fact with respect to whether Wireless Buybacks or Simple Cell acted to exclude Sprint from the marketplace or "damage" Sprint as a "competitor." *See Trimed*, 977 F.2d at 891 (endorsing definition of unfair competition as covering acts taken "to exclude [plaintiff] . . . from the marketplace, or to damage them as competitors").  The court will also deny Simple Cell's cross motion for summary judgment on this issue. Simple Cell's cross motion for summary judgment largely consists of a critique of Sprint's ESN Analysis. (See SC Resp. in Opp'n & Cross Mot. Summ. J. 34–37). The court will deny summary judgment in order to allow further development of the record to Sprint's ESN Analysis.

Count 5: Unjust Enrichment

33

In Maryland, a claim of unjust enrichment has three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007) (quoting *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 757 A.2d 108, 113 (2000)).

Unjust enrichment is a quasi-contract claim. *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 101 (2000). "At the heart of the concept of unjust enrichment is the willingness of the court under appropriate facts to say that there was an implied or constructive contract between the plaintiff and defendant." *Bank of Am. Corp. v. Gibbons*, 173 Md.App. 261, 918 A.2d 565, 569 (Md. 2007). To the extent an express contract between Sprint and Wireless Buybacks controlled the subject matter at issue, then, Sprint cannot seek relief through unjust enrichment. Sprint recognizes this, explaining that it seeks to recover under unjust enrichment "to the extent that the Court does not find in Sprint's favor on its other claims." (Sprint Reply, WB Resp. in Opp'n & Cross Mot. Summ. J. 47).

The court will deny Sprint's motion for summary judgment on unjust enrichment. To the extent that Sprint pursues its unjust enrichment claim as an alternative to its breach of contract claim against Wireless, its unjust enrichment claim is barred. *See J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 608 (D. Md. 2015). And to the degree Sprint pursues this claim as an alternative to other claims not yet decided in this court, summary judgment at this time would be premature.

The court will also deny Simple Cell's summary judgment motion on this issue. Simple

Cell incorrectly argues that Sprint cannot recover for unjust enrichment because the Terms & Conditions contained in Sprint's contracts with its customers "explicitly provide the remedy and preclude an unjust enrichment claim." As explained, however, Sprint would be barred from bringing an unjust enrichment claim only to the extent that a contract existed between Sprint and Simple Cell concerning the same subject matter on which the unjust enrichment claim rested. *See id.* at 608.

Count 4: Civil Conspiracy

In Maryland, a civil action for conspiracy requires 1) a confederation of two or more persons by agreement or understanding, 2) some unlawful act done in furtherance of the conspiracy, and 3) actual legal damage resulting to the victim-plaintiff. *Van Royen v. Lacey*, 262 Md. 94, 98 (1971). An unlawful act is not necessarily a criminal act, rather it "connotes a tort, or breach of contract, or other actionable wrong." *Columbia Real Estate Title Ins. Co. v. Caruso*, 39 Md. App. 282, 289 (1978). Civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154 (2007).

A. Wireless Buybacks

In its motion for partial summary judgment, Sprint alleges three conspiracies: a conspiracy between Wireless and John Snyder; between Wireless Buybacks and Tiffany Kennedy; and between Wireless Buybacks and Simple Cell. These will be examined in turn.[14]

First, Sprint alleges that Wireless Buybacks and Brendan T. Skelly conspired with 31 Echo, a former sub-dealer for Sprint, and its owner, John Snyder. Under the alleged conspiracy,

---

[14] Sprint appears to allege new theories of civil conspiracy in its reply brief. (See Sprint Reply, WB Resp. in Opp'n & Cross Mot. for Summ. J. 48–49). To the extent these arguments go beyond those contained in its original motion for partial summary judgment, the court will not consider them. *See Clawson*, 451 F. Supp. 2d at 734.

Snyder and Skelly collaborated to establish Wireless accounts with Sprint in order to buy discounted upgrades on these accounts and then resell them for a profit – even though Snyder and Skelly both knew this was not allowed under their contractual obligations with Sprint. (Sprint Mot. Partial Summ. J. 38). While the record may show wrongful behavior by Skelly and Snyder, it does not yet clearly establish the independent tortious injury required for a civil conspiracy claim. Second, Sprint claims a conspiracy existed between the Wireless Buybacks defendants and Tiffany Kennedy with respect to the acquisition and resale of Sprint phone upgrades. (Sprint Mot. Partial Summ. J. 38). The court will deny summary judgment here too. Kennedy all but admits that she abused her access to her employer's corporate account for personal gain. (Id. Ex. G ¶ 7). But there is no evidence at this point that Kennedy and Brendan Skelly had reached an agreement on a common unlawful act, rather than two distinct unlawful acts. Put differently, there is no evidence that Kennedy believed that reselling Sprint phones was an "unlawful act" – even if doing so without the permission of her employer undoubtedly was. Similarly, there is little evidence that Skelly knew Kennedy was failing to pass along payments to her employer for the phones she resold. Third, Sprint claims a conspiracy existed between Wireless Buybacks defendants and the Simple Cell defendants. Summary judgment will be denied. Sprint alleges the Simple Cell defendants "conspired with the Wireless Buybacks Defendants to unlawfully obtain Sprint Phones, and they substantially profited from each other's handset trafficking." (*Id.* 38). But the evidence at most shows that Wireless and Simple Cell engaged in regular business relations, and that is not enough.

B. Simple Cell

The court will deny Sprint's request for summary judgment on civil conspiracy with

respect to Simple Cell and also will deny Simple Cell's request for summary judgment on this same issue. Sprint alleges two conspiracies with respect to Simple Cell: a conspiracy with Wireless Buybacks to further the alleged scheme to traffic Sprint phones and an alleged conspiracy with Diana LaFleur. Despite Sprint's assertions to the contrary, however, there are genuine disputes as to whether Simple Cell's interactions with Wireless Buybacks and Diana LaFleur were anything more than legitimate business dealings.

## II. Skelly, Lowe, & Salkeld Cross Motions for Partial Summary Judgment

In their Response, Wireless Buybacks defendants Skelly, Lowe, and Salkeld have cross moved for summary judgment on Sprint's breach of contract claims, and defendant Salkeld has cross moved for summary judgment on Sprint's other statutory and tort claims. (WB Resp. in Opp'n & Cross Mot. 69-71).

Concerning breach of contract, Sprint claims (and this court agrees) that Wireless Buybacks breached its contract with Sprint by failing to pay monthly service charges and early termination fees for 667 phones it had ordered. (Sprint Mot. Partial Summ. J. 24). In Maryland, individuals may be liable for the breach of contract of a corporation "if they use a corporation for the deliberate purpose of making a contract for it, when at the time they intend to defraud a party thereto, and the contract is merely an avenue on which the fraud operates." *Ace Dev. Co. v. Harrison*, 76 A.2d 566, 570 (Md. 1950). There are disputed facts as to intent and the degree of personal involvement with respect to Lowe, Salkeld and Skelly. The motion for summary judgment with respect to these individuals will be denied.

## III. Simple Cell Defendants' Cross Motion on Sprint's Statutory Claims & Shannon Skelly

Simple Cell also cross moves for summary judgment on Sprint's CFAA and trademark

claims. It further claims summary judgment is appropriate with respect to Shannon Skelly. These motions will be examined below.[15]

A. CFAA Claims (Counts 9, 10, & 11)

Simple Cell first moves for summary judgment on Sprint's claim under 18 U.S.C. § 1030(a)(6), which outlines liability for an individual who "knowingly and with intent to defraud traffics . . . in any password or similar information through which a computer may be accessed without authorization." Simple Cell also moves for summary judgment on Sprint's claim under 18 U.S.C. § 1030(a)(4), which imposes liability on an individual who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value…." Sprint claims Simple Cell has violated these CFAA provisions, partly because it allegedly paid a third party to hack into Sprint's protected computer networks to determine if phones Simple Cell had obtained had "clean" ESNs. (Sprint Reply/Response, SC Resp. in Opp'n & Cross Mot. 50).

According to Simple Cell, summary judgment in its favor is appropriate as to these claims because both claims require an "intent to defraud," and evidence to support an intent to defraud is lacking in this case. In response, Sprint has submitted evidence indicating that Simple Cell paid a third-party vendor, Mr. Tijerina, to check ESNs for Sprint phones and that Mr. Tijerina hacked into Sprint's computer networks using "confidential passwords and misrepresentations." (Second Breithaupt Decl. ¶ 32). Summary judgment on these CFAA claims will be denied in order to allow further development of the record at trial as to whether Simple Cell had an intent to defraud and whether the other elements of these two CFAA claims are met.

---

[15] To the extent that Sprint moves for summary judgment on new issues not raised in its original motion for partial summary judgment in response to Simple Cell's cross motion for summary judgment, the court declines to consider them at this time.

Simple Cell has also moved for summary judgment on Sprint's claim that it violated 18 U.S.C. § 1030(a)(5)(C), which imposes liability on an individual who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." Sprint claims, inter alia, that defendants breached this provision through working with Mr. Tijerina. The court will deny summary judgment here too.

B. Trademark Infringement (Counts 12, 13, & 14)

To prevail on a claim of trademark infringement under the Lanham Act, a plaintiff must show: "(1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred 'in commerce'; (4) that the [opposing party] used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers." *Lamparello v. Falwell,* 420 F.3d 309, 313 (4th Cir. 2005) (quoting *Doughney*, 263 F.3d 359, 364 (4th Cir. 2001)). Simple Cell's motion for summary judgment will be denied in light of evidence put forth by Sprint related to a likelihood of confusion and the so-called "first sale" doctrine. (*See, e.g.*, Second Breithaupt Decl. ¶ 29).

C. Shannon Skelly

Simple Cell also cross moves for summary judgment with respect to Shannon Skelly, a part-time employee of Simple Cell, claiming that she "had no responsibilities in Simple Cell for the procurement, sale, or handling of phones." (SC Resp. in Opp'n & Cross Mot. 53). Sprint has offered sufficient evidence to create a genuine dispute of material fact with respect to the extent of her involvement in Simple Cell, and the motion will be denied.

IV. Motion for Relief from Temporary Restraining Order

Separately, Wireless Buybacks, LLC has petitioned this court for relief from a TRO entered into on March 5, 2013, so that it can sell 1,114 new, non-refurbished iPhone 5s. The motion for relief raises three interrelated issues. The first is whether Wireless Buybacks may now sell these particular iPhones because they are no longer subject to the TRO. If such relief is not warranted at this time, the second issue is whether Sprint must provide additional information to Wireless Buybacks related to these phones in order to keep them under the TRO. If the TRO will continue to apply to these 1,114 iPhones, the third issue is whether the court should require Sprint to post a new, higher bond. (WB Mot. Relief from TRO).

A. Background

The TRO at issue here bars Wireless Buybacks, LLC from selling new, non-refurbished iPhone 5s unless Sprint has determined those phones are not "stolen," meaning they were not obtained through three types of wrongdoing: "burglary, subscription fraud, and equipment fraud."[16] (ECF No. 43, 7 n.18). The TRO is explicit in this regard: Wireless Buybacks is to provide ESNs for phones in its possession it would like to sell to Sprint, and it can only sell those that "Sprint has determined . . . are not stolen." (*Id.* 8).

On June 27, 2013, Wireless Buybacks sent Sprint a list of 692 ESNs from phones that had been returned to it by the Federal Bureau of Investigation. Wireless Buybacks requested that Sprint confirm these phones were not stolen and thus not subject to the TRO. Sprint analyzed these ESNs and determined at least 442 were obtained through various types of theft or fraud, while no information was available on 179 phones known as Apple Sales Channel Phones. (WB Mot. Relief from TRO Ex. B, ECF No. 292-4). Of those phones that were the subject of theft or

---

[16] Under the TRO, "subscription fraud" is when "a criminal uses someone else's identity to activate an account, acquires phones under that account, and sells the phones on the black market." The term "equipment fraud" refers to instances where a criminal "orders a phone and bills it to a legitimate customer's account." (ECF No. 43).

fraud, it appears that not all were covered by the three types of wrongdoing outlined in the TRO. Nonetheless, Sprint claimed they all constituted critical evidence in the ongoing litigation and that loss of this evidence would be prejudicial. (See id. 4). Wireless Buybacks then agreed not to sell them until further notice. (Id. Ex. C, ECF No. 292-5).

In March 2016, Wireless Buybacks asked Sprint to check the ESNs of these 621 phones again. It did so in light of the fact that Wireless Buybacks had submitted these same 621 ESNs – along with 493 new ESNs – to a third-party database, www.checkmend.com, and that database had concluded the ESNs were "clean." Wireless thus sought confirmation from Sprint that these 1,114 phones were not covered by the TRO. (WB Mot. Relief from TRO 2–3). On April 1, 2016, Sprint informed Wireless Buybacks that a "coding error" in the third-party database had yielded incorrect results with respect to these phones, and that the error had since been addressed. If Wireless Buybacks re-checked the ESNs through the third-party database, they would register in that database as "stolen, lost or blocked." Wireless Buybacks finds the "coding error" explanation "dubious" and suggests that Sprint "forced CheckMEND to change the status of these phones specifically to prevent Wireless Buybacks from selling them." (*Id.* 3–4).

B. Analysis

The TRO provides that Wireless Buybacks, LLC may not sell the phones at issue here unless Sprint determines they are not "stolen" as defined by the TRO. Accordingly, it is not dispositive that a third-party database indicated at one point that some Wireless Buybacks phones were not stolen – even if, as Wireless Buybacks notes, Sprint provides information to that database. Similarly, the fact that the third-party database registers the phones at issue here as "lost, stolen, or blocked" does not mean that they are no longer subject to the TRO – the

41

determinations of the third-party database do not control. (*See* Wireless Mot. Relief from TRO Ex. G). Further, there is no reason to modify the bond requirements in this case in light of these new developments. Wireless Buybacks still has no right to stolen property, and circumstances have not changed sufficiently to warrant revisiting the amount of the bond.

On the other hand, it appears that not all of the phones at issue here were "stolen" within the meaning of the TRO. (*See* WB Mot. Relief from TRO Ex. B, ECF No. 292-4). The court has suggested today that Sprint may seek admission of its ESN Analyses pursuant to Fed. R. Evid. 1006 by providing defendants with certain underlying documentation. This documentation may alleviate any concerns Wireless Buybacks has with respect to the lot of 621 phones that Wireless claims it should now be able to sell. If it does not, Wireless Buybacks should notify the court. With respect to the other 493 ESNs that Wireless Buybacks claims are "clean," the court concludes that Sprint should similarly provide documentation concerning why these phones are "stolen" within the meaning of the TRO. The TRO calls on Sprint to determine whether phones are "stolen" or not, and Sprint has not yet done so with respect to these phones.

## <u>CONCLUSION</u>

For the aforementioned reasons, Sprint's motion for partial summary judgment will be granted in part and denied in part. The cross motions for summary judgment by Brendan T. Skelly, Kevin Lowe, and Edward Salkeld will be denied. The cross motion for summary judgment by the Simple Cell Inc., Nicholas Skelly, Christopher Metzger, and Shannon Skelly will be denied. The motion by Wireless Buybacks, LLC for relief from a temporary restraining order will be denied. Additionally, a consent motion for leave to exceed the page limit for Simple Cell defendants' summary judgment opposition and cross motion will be retroactively granted,

and the motion for leave to file under seal will be granted. A separate order follows.


March 31, 2017                                    _____/S/_____
Date                                             Catherine C. Blake
                                                 United States District Judge